IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,           :
                                    :
        v.                          : CRIMINAL NO. 1:10-CR-94
                                    :
SHAWN CHAMBERS-GALIS,               :
        Defendant                   :

M E M O R A N D U M

I.  *Introduction*

Defendant, Shawn Chambers-Galis, has filed a counseled motion under 28

U.S.C. § 2255 to vacate her conviction and sentence.  Defendant was a partner at

Donegal Settlement Services, Ltd (DSS), a real-estate closing and settlement business.

A jury found her guilty of wire fraud in violation of 18 U.S.C. § 1343 after she used her

authority over DSS's escrow accounts and an operating account to shift funds to her own

bank account.  Defendant was sentenced to fifty-seven months' imprisonment, three

years' supervised release, and $258,894.39 in restitution.[1]

Defendant makes a Sixth Amendment claim against the court and Sixth

Amendment ineffectiveness claims against trial counsel and sentencing counsel.[2]  The

Sixth Amendment claim against the court is that we refused to grant her a postponement

_____

[1]  Defendant was also charged with four counts of money laundering under 18 U.S.C. §
1956(a)(1).  The jury acquitted her of those charges.

[2] Defendant retained a different attorney for sentencing.  She took a direct appeal *pro
se.*  Represented by her counsel in these 2255 proceedings, she moved to dismiss the direct
appeal, believing there were no valid issues to be raised on direct appeal and that the proper
route for relief was by way of a 2255 motion.  On January 25, 2012, the Third Circuit granted
the dismissal motion.  *United States v. Chambers-Galis*, No. 11-2529 (3d Cir.).

of trial to obtain new trial counsel after she wrote us complaining about trial counsel's preparation. As part of this claim, Defendant also asserts we failed to follow the procedure mandated by the Third Circuit when a defendant requests that her counsel be replaced.

The following claims allege trial-counsel ineffectiveness. First, counsel improperly obtained court appointment as Defendant's lawyer even though he had expressed his belief to her while representing her in state criminal proceedings that she had lied to him and to other lawyers. Defendant contends trial counsel could not continue to represent her after expressing these beliefs. Second, counsel failed to obtain a handwriting expert (as requested by Defendant) "to verify" that Shannan Donivan's signature on many DSS checks alleged to have been forged by Defendant were in fact signed by Shannan Donivan. (Doc. 84, ECF p. 7).[3] Third, counsel failed to obtain the hard drives from William Donivan's and DSS's computers. These hard drives would have contained her written employment agreement with DSS and e-mails from William Donivan. The employment agreement would have shown that Defendant was entitled to compensation and to reimbursement for her out-of-pocket expenses. The e-mails would have shown that Donivan authorized Defendant to transfer funds to her own account. Fourth, counsel's ten voir dire questions were perfunctory. Fifth, counsel failed to adequately interview and call witnesses at trial who would have bolstered the defense

_____

[3] Shannan Donivan was an employee of DSS and the daughter of William "Bill" Donivan, a partner in DSS. We note that her first name is spelled "Shannon" in the transcripts.

2

that William Donivan and Shannan Donivan were also involved in the day-to-day operation of DSS and also had authority over the escrow accounts. Sixth, counsel refused to subpoena and present at trial e-mails William Donivan sent to Defendant that would have showed that William Donivan approved of the fund transfers Defendant performed, that he was actively involved in DSS's daily operations and that he and Shannan Donivan were responsible for reconciling the escrow accounts. On this claim, Defendant also asserts she provided counsel with the e-mails. Seventh, counsel refused to subpoena Defendant's credit-card records that would have buttressed her testimony that she had used her credit card to make purchases for DSS. Eighth, counsel refused to subpoena Defendant's phone records which would have shown that William Donivan was constantly calling her and thus involved in the daily management of DSS. Ninth, counsel failed to explain a plea bargain to Defendant, resulting in a more severe sentence than she otherwise would have received.

The following claims allege sentencing-counsel ineffectiveness. First, counsel requested two postponements of sentencing to file objections to the presentence report (PSR) and then filed no objections. Second, counsel failed to file objections to portions of the PSR that stated Defendant had engaged in conduct similar to the criminal offense on two previous occasions, (PSR ¶¶ 28 and 32), knowing that these similar incidents would lead to a more severe sentence. Defendant could have contradicted these allegations with her own testimony and other witnesses. Third, counsel said he would file post-trial motions but he failed to do so.

II.  *Discussion*

> A.  *The Sixth Amendment Claim that the Court Refused to*
>     *Grant Defendant a Postponement of Trial to Obtain New*
>     *Trial Counsel After She Complained to the Court About*
>     *Trial Counsel's Preparation*

Defendant complains that the court failed to follow the procedure mandated by *United States v. Peppers*, 302 F.3d 120, 132 (3d Cir. 2002), when a defendant requests that she be allowed to replace her counsel.  She contends that failure to follow this procedure requires reversal of her conviction.  *See United States v. Goldberg*, 67 F.3d 1092, 1098 (3d Cir. 1995).  As part of this claim, she also contends she was entitled to a trial postponement when she requested one a month before the scheduled date of the trial to obtain new counsel.

We note at the outset that it appears that this claim should be dismissed because it should have been raised on direct appeal.  The court either did or did not follow the *Peppers* procedure.  Collateral proceedings would reveal no facts that would further illuminate that claim.  Likewise, the court's decision not to postpone trial to allow Defendant to obtain new counsel could have been decided on the record available for appeal.  A section 2255 motion is a collateral attack on a final criminal judgment.  *See United States v. Addonizio*, 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979).  It is not a substitute for an appeal.  *Government of the Virgin Islands v. Nicholas*, 759 F.2d 1073, 1074-75 (3d Cir. 1985).  It appears Defendant could only raise this claim now if she shows cause for her failure to pursue the issue previously and prejudice to her as a

4

result.  *See United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816

(1982).  It does not appear that Defendant can show cause as she had filed a direct

appeal, but she then chose to have it dismissed on the ground that her "best chance to

obtain relief from her conviction" was by way of a 2255 motion.  *United States v.

Chambers-Galis*, No. 11-2529 (3d Cir.)(Mot. to Dismiss Direct Appeal, filed Jan. 25,

2012, ¶ 6).  In any event, the claim lacks merit.

We provide the background.  Defendant's trial was scheduled for

September 8, 2010.  On July 30, 2010, the court received a letter from Defendant, dated

July 21, 2010.  (Def.'s Ex. 1).  The letter requested new counsel or, in the alternative, that

Defendant be allowed to proceed pro se.  It listed several complaints Defendant had

about trial counsel.  In part, Defendant complained that counsel had written her to say he

did not care about her case.  She also complained that he had failed to investigate her

defense properly or to talk to witnesses critical to her defense.  On August 9, 2010, the

court sent trial counsel a copy of the letter.  On August 11, 2010, trial counsel filed a

motion (Doc. 25) for a status conference.

On August 17, 2010, the status conference was held.  Trial counsel began

the conference by saying he wanted "to meet with the Court to flush out any issues raised

by that letter or to determine the client's intent at this point in time in terms of requesting

other counsel or proceed pro se or proceeding with me."  (Doc. 80, status-conference

transcript, p. 2).  The court asked counsel to summarize the problems that had been

expressed to him.  ((Id.).  Counsel did so in conclusory fashion, expressing his opinion

that Defendant had complaints about strategic decisions, which witnesses to call, the evidence to be presented, certain avenues of defense. (*Id.*). In response to an inquiry from the court, he also said he believed he was prepared to go to trial. (*Id.*, p. 3). The court asked Defendant if she "want[ed] to say anything about this." (*Id.*). She replied:

> Yes, Your Honor. I mean, I know for a fact that witnesses that I have that can truly put light on the situation of what happened. The house cleaner, the painter, and such have yet to be talked to. E-mails that really need to be admitted into evidence to prove so it's not a he said/she said situation. Nothing has been done. My position from day one has always been that other people signed my checks, and nothing has been done to prove that.

(*Id.*, pp. 3-4). She also complained that counsel had not responded to a question she had about a recent offer of a plea bargain, (*id.*, p. 4), a question about that part of the offer involving a three-level reduction for acceptance of responsibility.

The court told Defendant that counsel handled trial strategy except for a defendant's decision to testify or to plead guilty and that if a defendant is found guilty, there were postconviction procedures for challenging counsel's performance. The court continued:

> So I think you're going to have to decide whether you want to cooperate with Mr. Boyle and let him handle your case or whether you want to proceed pro se, which I think would be a very big mistake on your part.
>
> Mr. Boyle has been in my court many many times. He knows what he is doing. He's a good lawyer, and he gives his clients good representation. If you had trouble communicating with Mr. Boyle, or were unwilling to communicate with him, I urge you to repair that situation and to get back to the point where you and he can prepare to present a defense on

September the 8th, I think it is. I don't think I can tell you anything further than that today. So you're going to have to decide what you want to do.

I hope you will let Mr. Boyle continue to represent you. I'm not going to appoint another attorney for you because, you know, this just goes on and on if people aren't satisfied with their lawyers. There is a procedure to review the performance after a conviction, but there's nothing the Court can do to satisfy you about how Mr. Boyle is handling your case at this time. I hope you will let him decide how to handle your case, what to present, because I think he would know better than you what is going to be in your best interest. . . .

(*Id.*, pp. 6-7).

Defendant still expressed concerns:

Sir, I understand and I hear what you are saying. However, I have attempted to communicate and I am the one who does not get a response. I asked to be openly involved and put records back together. I've been blocked from doing that, sir.

(*Id.*, p. 7). A discussion then ensued about the records. The prosecutor assured the court that he had provided trial counsel with "all the relevant bank account records." (*Id.*, p. 8). Trial counsel stated he believed he had everything he should have. (*Id.*). The conference concluded as follows:

THE COURT: What I would ask is . . . . What I would ask is that you two try to talk here this morning. I'll give you the use of the courtroom.

. . . .

THE COURT: Try to get this thing back on track so you can come in here on the 8th of September ready for trial. Will you do that?

MR. BOYLE: Certainly, Your Honor.

7

THE COURT: Will you do that?

THE DEFENDANT: Yes, sir.

THE COURT: All right. I think Mr. Boyle tries [his] best to satisfy you and represent you, but as I say, you can't supervise his handling of your case too much. Okay. I think that concludes the conference. Thank you very much.

(*Id.*, pp. 8-9). Trial commenced as scheduled on September 8 with trial counsel representing Defendant.

Defendant complains that our handling of the situation violated *Peppers*, *supra*. *Peppers* followed *United States v. Welty*, 674 F.2d 185 (3d Cir. 1982). *Welty* set forth the procedure a district court should follow when a defendant expresses a desire to replace her counsel. As set forth in *Welty*:

Where, on the eve of trial, a defendant seeks new counsel, or, in the alternative, opts to represent himself, the district court must engage in two lines of inquiry. First, the court must decide if the reasons for the defendant's request for substitute counsel constitute good cause and are thus sufficiently substantial to justify a continuance of the trial in order to allow new counsel to be obtained. If the district court determines that the defendant is not entitled to a continuance in order to engage new counsel, the defendant is then left with a choice between continuing with his existing counsel or proceeding to trial pro se, thus bringing into play the court's second stage of inquiry.

*Id.* at 187. Good cause consists of such matters "'as a conflict of interest, a complete breakdown in communication, or an irreconcilable conflict with [the] attorney.'" *United States v. Stubbs*, 281 F.3d 109, 117 (3d Cir. 2002)(quoting *Welty*, 674 F.2d at 188).

Defendant contends we did not follow this procedure. Specifically, she asserts that we failed to inquire as to the reasons why she sought to replace trial counsel. Indeed, she contends that we not only failed to make that inquiry, but that we also told her we "could and would not make such an inquiry prior to trial," and that we left her with no option but to meet and cooperate with trial counsel. (Doc. 101, Def.'s Reply Br., ECF p. 10).

The record shows otherwise. The status conference was held, as trial counsel said, about the issues raised in Defendant's letter, meaning her complaints about representation and what she wanted to do as to representation, whether she wanted to replace counsel, proceed pro se, or continue with him. Counsel listed her complaints, albeit in summary form. We asked Defendant if she "want[ed] to say anything about this," in context clearly asking her to describe her complaints and how she wished proceed concerning representation. She freely responded with her complaints about counsel. We then essentially determined there was no good cause to replace counsel, thus satisfying the first step of the *Peppers* procedure, when we told her she could proceed with counsel or represent herself pro se.[4]

Limiting Defendant to these two options was entirely proper under *Peppers*. We did "urge" Defendant to repair her relationship with counsel but did not tell her she had to use his representation, advising her instead that she was "going to have to decide

---

[4] A few moments later we also expressly stated that we would not appoint another attorney.

9

what [she] want[ed] to do," (Doc. 80, p. 7), and expressing our "hope" that she would allow counsel to "continue to represent [her]," stating that "he would know better than [her]" what would be in her "best interest." (*Id.*). We did ask her and counsel to talk and try to get the case back on track. They both agreed to do so. In no way did we instruct her to work with counsel or preclude her from proceeding pro se. In sum, there was no Sixth Amendment violation here and certainly nothing like the circumstances in *Peppers*, where the trial court failed to conduct an adequate inquiry after the defendant expressed a desire to represent himself pro se.

As part of this claim, Defendant argues that we erred in not granting her request for replacement counsel when the request was made a month before the scheduled date of the trial. We reject this argument. Defendant's counsel was court-appointed because she was indigent, so she had to show good cause for seeking a replacement. *United States v. Moses*, 58 F. App'x 549, 555 (3d Cir. 2003) (nonprecedential). Defendant has not attempted to show that she had good cause.

> B. *The Claim that Trial Counsel Violated the Sixth Amendment*
> *by Obtaining Court Appointment as Defendant's Lawyer Even*
> *Though He Had Expressed His Belief to Her that She Had*
> *Lied to Him and to Other Lawyers*

Defendant contends that trial counsel improperly obtained court appointment as her lawyer even though he had expressed his belief to her while representing her in state criminal proceedings that she had lied to him and to other lawyers. Defendant contends that the Sixth Amendment barred her lawyer from

continuing to represent her after expressing these beliefs and that this was "structural" error, sufficient by itself to require the conviction and sentence be vacated. (Doc. 101, Reply Br., ECF p. 10).

Counsel's sentiments were expressed in a letter, dated October 26, 2009. In pertinent part, the letter reads:

> While I am extremely disappointed by your failure to pay any attorneys fees, as you promised me you would, I would never do anything to jeopardize your case; on the other hand, your continued dishonesty is very troubling to me.
>
> . . . .
>
> When you spoke to the two assistant public defenders in the Eastern District of Pennsylvania and to Tom Kearney,[5] you misled them as to the cases that were pending against you. So, you have lied to them as you have lied to me. My duty is to represent you to the best of my ability, and I will do that. At this point, I would have difficulty believing anything you say. I have no trouble believing that . . . [is] a crook, but my objective review of the evidence leads me to the conclusion that you were heavily involved in everything that he did. You do, however, had [sic] a right to go to trial on this.
>
> Personally, I have no desire to continue representing you. If you no longer wish to have me represent you, just tell me in writing and I will file a second Motion to withdraw from your cases.

(Def.'s Ex. 6, pp. 1, 2)(footnote added).

Defendant cites no authority for the proposition that structural error occurs when an attorney continues to represent a client after he has told her that she has lied to

---

[5] The district attorney of York County, Pennsylvania.

him.  We reject this claim.  The Sixth Amendment does not guarantee a "meaningful relationship" with counsel.  *Morris v. Slappy*, 461 U.S. 1, 14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610 (1983).  A defendant has no right to a special rapport or even confidence in a court-appointed attorney.  *Siers v. Ryan*, 773 F.2d 37, 44 (3d Cir. 1985).  "The right to counsel does not include more than the right to representation by competent counsel at trial."  *Id.  See also United States v. Iorio*, No. 08-CR-068, 2008 WL 2810192, at *1 (M.D. Pa. July 21, 2008)(citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in stating that the Sixth Amendment guarantees effective assistance of counsel but that the guarantee "does not extend to the appointment of counsel of choice, or to special rapport, confidence, or even a meaningful relationship with appointed counsel").

We noted above that Defendant has failed to show good cause for replacing counsel.  We also note that counsel, despite questioning Defendant's credibility, at the same time recognized her right to a trial on the charges and that he would never do anything to jeopardize her case.  And at the 2255 hearing, he testified that he continued to represent her because, as he told her, he was going to do so to the best of his ability.  He also testified that he would move to withdraw if she wanted him to but that she said she wanted him to continue as her lawyer.

In these circumstances, Defendant's only Sixth Amendment claim against trial counsel must be established under *Strickland*, meaning she must show (1) that counsel's performance was deficient and (2) that it prejudiced her.  *Strickland*, *supra*, 466

12

U.S. at 687, 104 S.Ct. at 2064. Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. Defendant cannot rely on a claim of structural error.

C. *The Claim that Trial Counsel Was Ineffective in Submitting Ten Voir Dire Questions that Were Perfunctory*

Defendant argues trial counsel violated the Sixth Amendment because the ten voir dire questions (Doc. 32) he submitted were perfunctory and did not go into the factual circumstances of the case. The court used counsel's voir dire questions in part. (Doc. 74, ECF pp. 4-7). Defendant suggests that the questions should have explored the potential jurors' knowledge in the following areas:

> 1) their knowledge of the real estate business, 2) their knowledge of escrow accounts and the use of such accounts, 3) their knowledge of real estate companies and how they function, 4) their feelings about women in business, and in particular, women in charge of businesses, 5) their dealings with settlement companies, whether positive or negative, 6) whether they would trust the testimony of a former police officer and private investigator over that of an ordinary citizen or the Defendant?

(Doc. 94, ECF pp. 3-4).

We reject this claim. "One of the purposes of voir dire is to enable the court to select an impartial jury." *United States v. Cunningham*, 694 F.3d 372, 392 (3d Cir. 2012)(internal quotation marks, quoted case, and brackets omitted). Examination of the

13

voir dire in this case indicates that there is no reason to question that an impartial jury was chosen.[6]  Additionally, to succeed on this claim, Defendant would have to show prejudice.  See *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011)(defendant has to show a juror was actually biased against him).  *See also Keith v. Mitchell*, 455 F.3d 662, 676 (6th Cir. 2006)("Even if we assume counsel's *voir dire* strategy to be objectively unreasonable, Keith must still demonstrate prejudice to prevail on his ineffective assistance of counsel claim," meaning that the fairness of the trial was substantially undermined).  Defendant has not alleged a juror was biased or shown that the fairness of the trial was undermined.

> D. *The Claim that Trial Counsel Was Ineffective in Refusing to Subpoena and Present at Trial E-mails William Donivan Sent to Defendant that Would Have Showed that William Donivan Approved of the Fund Transfers Defendant Performed, that He Was Actively Involved in DSS's Daily Operations and that He and Shannan Donivan Were Responsible for Reconciling the Escrow Accounts*

Defendant claims trial counsel was ineffective when he refused to subpoena and present at trial e-mails William Donivan sent to Defendant that would have showed that he approved of the fund transfers Defendant performed, that he was actively involved in DSS's daily operations and that he and Shannan Donivan were responsible for reconciling the escrow accounts.  On this claim, Defendant also asserts she provided counsel with some e-mails.

---

[6]  We note that postconviction counsel's question 6 was essentially covered in the voir dire when the court asked potential jurors if they would give greater weight to the testimony of law enforcement officers simply because of their employment.  (Doc. 74, ECF pp. 5-6).

We provide some background. DSS had an "old" escrow account, a "new" escrow account, an operating account, and a line of credit. The government charged Defendant with wire fraud in writing checks on the old escrow account, placing the funds into the operating account, and then writing checks on the operating account that she put into her own personal bank account.[7] The government also presented evidence that Defendant maintained sole control of DSS's bank statements and checks, actively excluding other employees, including Shannan Donivan, from access to the statements. The scheme ran from roughly August 2005 through the end of 2007. At the latter point, numerous checks were being returned for insufficient funds. In January 2008, William Donivan and another DSS partner contacted Land America and notified it of the shortfall.[8]

Defendant admitted at trial that she wrote the checks. She also admitted that she had signed Shannan Donivan's name to a number of checks drawn on the operating account, with the explanation that it was common for those with check-writing authority at DSS to sign each other names to checks.[9] As confirmed by her trial counsel

---

[7] At one point, money was transferred from the new escrow account into the old escrow account. Transfers were made from the old escrow account into the operating account and then into Defendant's personal account.

[8] Land America is a shorthand name for Land Title Insurance Company. DSS was an agent for Land America, assisting in the issuance of title insurance. Land America terminated DSS's agency after the shortfall in funds was confirmed. (Doc. 75, trial transcript, ECF pp. 85-90).

[9] Defendant testified that this practice arose when Shannan Donivan mentioned that a man she had been seeing observed one of her paychecks with her own signature on it. For some reason, this made her whine to her father. William Donivan then decided that Defendant could sign Shannan Donivan's name on Defendant's paycheck and vice-versa. (Doc. 52, transcript of Defendant's trial testimony, ECF p. 16). From this arose the practice of signing each other names to checks.

at the 2255 hearing, her defense strategy at trial was to establish she had no intent to defraud, an essential element of the wire-fraud offense.  To that end, Defendant testified that: (1) she had a written employment agreement with DSS prepared by William Donivan that paid her $65,000 per year in compensation and reimbursement for DSS expenses she paid for and covered her health insurance and cell-phone expenses (Doc. 52, ECF pp. 10, 17-18); (2) the transfers to her bank account represented compensation and reimbursement under the employment agreement; (3) William Donivan authorized each and every transfer either orally or by e-mail; (4) the money was taken from an escrow account, but William Donivan had told her that the money had been mistakenly transferred there from the line of credit by a previous employee or otherwise represented money DSS had earned on mortgage settlements, so it was proper to draw from the account even if it was an escrow account; and (5) Defendant, albeit a real estate agent, had no experience in running title-insurance companies, and she trusted William Donivan's advice, especially since she had developed a romantic relationship with him. Defendant also testified that she had never seen any of the bank statements and that she had merely written checks at the direction of William Donivan.

Defendant claims that William Donivan's e-mails would have bolstered her defense because it would no longer have simply been her word against that of William Donivan.  Donivan testified at trial there was no employment agreement and he had never authorized transfers from the escrow accounts for Defendant's benefit.

At the 2255 hearing, trial counsel testified that he had not subpoenaed any records from DSS because it no longer existed. He had subpoenaed William Donivan's records, all the records he could. Defendant had brought him documents, some of which were e-mails. He decided not to use the e-mails because they indicated she knew what was going on and tended to prove her guilt. Specifically, they showed she knew what an escrow account was and that she questioned why money was being taken out of the escrow account.

Postconviction counsel presented trial counsel with several e-mails. One of them was an e-mail from Shannan Donivan to Defendant, dated April 10, 2007, indicating that Shannan Donivan had been entrusted with a bank statement to reconcile, what she had done in that attempt, and describing her effort as making it easier "when we can finally reconcile." (Def.'s Ex. 9). Postconviction counsel asked trial counsel if this would have rebutted the government's evidence that only Defendant handled the bank statements and reconciled them. Trial counsel testified that the e-mail would also have shown Defendant's involvement, which was not the defense position at trial.

Trial counsel was presented with another e-mail, dated October 20, 2006, from William Donivan to the DSS partners, including Defendant. In the e-mail, William Donivan writes:

> [w]e were visited by Nanci Reese and Joe Troutman of Land America yesterday. Joe . . . worked all day with Shannan on the software and also on reconciling the bank accounts. . . . Both of these individuals [Reese and Troutman] were well pleased with all that Shawn has accomplished with Donegal. . . .

> Now, per Shawns [sic] suggestion, we are opening a new
> Escrow account with the bank and have requested that this
> account be a sweep account. . . . Only George, Shawn and
> Shannan are signers of checks, I am the reconciliation
> person. . . .

(Def.'s Ex. 10)(footnote added).  Postconviction counsel contends this would have

rebutted the government's position that Defendant was keeping the financial information

away from others at DSS.  Trial counsel testified that while the e-mail would have shown

that William Donivan was involved in the accounts, it would also have shown Defendant's

involvement in the company when the defense strategy was to minimize her knowledge.

"Judicial scrutiny of counsel's performance must be highly deferential."

*Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.  We must ignore our hindsight knowledge

that the strategy did not work and evaluate counsel's conduct from his "perspective at the

time."  *Id.*, 104 S.Ct. at 2065.  Under this standard, we see no deficiency in counsel's

failure to use these e-mails.  Counsel's strategy was to show that Defendant considered

William Donivan to have superior expertise and that she simply bowed to his advice and

instructions in writing checks.  E-mails, like Exhibits 9 and 10, showing that Defendant's

involvement in the business was more than minimal would have contradicted that

strategy.  Additionally, we do not believe that the outcome would have been different if

Exhibit 10 had been used at trial.  That e-mail only showed that William Donivan was

supposed to reconcile the statements; it does not indicate he actually did so.

Defendant does assert a far more focused claim, that trial counsel was

ineffective in not presenting the e-mails from William Donivan authorizing her to write the

checks that were the basis of the wire-fraud charge against her. Defendant says that these e-mails were on the DSS computers. At the 2255 hearing, she also said they were on her own personal computer, which was present in court that day in her attorney's possession. However, she said she could not "access" them on her personal computer and had not retained an expert to retrieve them because she did not have the money.

In these 2255 proceedings, Defendant has the burden of proving that she is entitled to relief. *United States v. Eakman*, 378 F.3d 294, 302 (3d Cir. 2004). In the absence of any evidence that these e-mails exist, we decline to grant any relief on the basis that William Donivan sent Defendant e-mails authorizing her to withdraw money from the old escrow account.[10]

Defendant questioned trial counsel about other e-mails. One of them was an e-mail, dated August 23, 2007, Defendant sent to the DSS partners. (Def.'s Ex. 16). The e-mail asked for assistance with DSS, noting that she had to again advance $500 to DSS to make payroll, which she could not afford. Defendant suggested that the line of credit be increased or that the partners share the deficits equally. The e-mail noted that Defendant needed $6,350 per month just to make payroll.

Postconviction counsel suggested that the e-mail could have been used to rebut the testimony at trial that William Donivan and Shannan Donivan did not know about DSS's "poor finances" because Defendant had hidden the information from others.

_____

[10] At the hearing, Shannan Donivan said she had brought any remaining DSS computers with her in her car. She agreed to turn these computers over to postconviction counsel. We agreed to hold further proceedings depending upon what an inspection of the computers showed.

Trial counsel said he did not show the e-mail to the jury because it would have shown a motive for stealing from the escrow account. We agree with trial counsel that this was a proper strategy. Thus counsel's performance was not deficient in not using this e-mail at trial. We also note that William Donivan and Shannan Donivan did not testify that Defendant had kept them in the dark about DSS's "poor finances." William Donivan did testify that he was surprised at the end of 2007 when checks from the escrow accounts intended for third parties did not have sufficient funds to cover them. (Doc. 75, William Donivan testimony, ECF p. 116).

Another e-mail is one from Defendant to William Donivan, dated October 7, 2007. In part, in this e-mail, Defendant noted: (1) she had borrowed $3,000 for her personal use and then had given it to DSS so it could remain current; (2) Defendant had made a decision to cut back Shannan Donivan's and another employee's hours only to have it countermanded by him; (3) Exit Four Star, a real estate brokerage they had started, could not be operated the way DSS had been because "[i]f individuals are not held accountable for their actions the company and the Broker will be fined. According to [the] real estate licensing act, the Broker is responsible for the actions of their salespersons . . . " (Def.'s Ex. 17).

Postconviction counsel argued that this e-mail would have shown that Defendant was trying to help the business and was not the "evil force . . . hiding records and stealing money" as portrayed by William Donivan and Shannan Donivan. Trial counsel did not use the e-mail because it went against the strategy of depicting

Defendant as simply trusting William Donivan and following his orders. Trial counsel was mindful that there was a record of funds leading from the old escrow account through the operating account and into Defendant's personal bank account. The e-mail would have shown her intimately involved in business operations, contrary to the defense strategy adopted. We agree with trial counsel that the decision not to use this e-mail was acceptable trial strategy.

Another e-mail is one from a DSS partner to the other partners in DSS, including William Donivan and Defendant, dated July 20, 2005, very early in Defendant's tenure with DSS. (Def.'s Ex. 18). The e-mail says that the sender and Defendant went through DSS's accounts. The e-mail lists the current monthly expenses, indicates DSS is in the red, but asserts it could break even in the near future. Postconviction counsel suggested that this e-mail could have been used to show that, despite the trial testimony of William Donivan and Shannan Donivan, they did have knowledge of the day-to-day operations of DSS. Trial counsel did not recall seeing the e-mail but said he would not have used it because it would have shown Defendant's involvement in the business as well.

We agree with trial counsel that a decision not to use this e-mail would have been acceptable trial strategy. We also think that failure to introduce it at trial would not have changed the outcome. Shannan Donivan was not working for DSS at the time of this e-mail so it has no bearing on her testimony. As to William Donivan, this e-mail is not relevant for two reasons: (1) it comes too early to be relevant; and (2) his knowledge of

day-to-day operations would not be relevant to any issue at trial. William Donivan's testimony was that he was not handling the books, not that he was unaware of "day-to-day operations," whatever Defendant might mean by this broad phrase. The e-mail thus is not material either to negate the offense or to impeach his testimony.

E. *Other Evidentiary Matters*

At the 2255 hearing, postconviction counsel presented other evidentiary material that he asserted should have been used at trial. One is a letter, dated March 9, 2007, written by William Donivan to Wells Fargo. (Def.'s Ex. 19). It relates to the false double-payment explanation attributed to Defendant as a way of covering certain of her withdrawals from the old escrow account.

We provide some background. Both the government and Defendant can agree on the following. The only issue is who originated the explanation, William Donivan or Defendant.

Defendant started as a partner but became involved in DSS's daily business in June or July 2005. At that time, the old escrow account contained $105,000, representing money owed to a client of an attorney named Charles Petrie on a house sale. DSS had issued a check for this amount, but the check was not immediately cashed. This left money in the account for Defendant to start making her withdrawals. Eventually, Petrie's client asked Petrie for the check but by that time, Petrie thought a new check was in order. In June 2006, he approached DSS about a new check. However, because of Defendant's withdrawals, there was not enough money in the old

escrow account to cover a new check.  Petrie was told that DSS could not immediately issue a new check because a former  employee had mistakenly made a double payment to Wells Fargo on a previous settlement.[11]

This explanation put off any inquiry into the real reason why DSS could not issue a new check.  William Donivan testified at trial that the explanation had come from Defendant.  Defendant testified to the opposite.  The government argued Defendant had fabricated the story to cover her illegal transactions.  William Donivan's letter to Wells Fargo described previous communications with Wells Fargo and demanded reimbursement of the funds.

At the 2255 hearing, postconviction counsel argued the letter would have shown that William Donivan was intimately involved in making the claim against Wells Fargo for the double payment.  This would have buttressed Defendant's testimony that William Donivan was the source of this falsehood, not her.  Trial counsel testified at the 2255 hearing that he did not recall seeing the letter but he would have used it at trial because it did not implicate Defendant.

We reject this claim.  The record shows that trial counsel did in fact use this letter at trial, (Doc. 75, ECF pp. 147-150), and did argue to the jury that it showed that William Donivan had created the double-payment explanation.  (Doc. 76, ECF p. 28).

---

[11]  Petrie eventually got his new check on March 22, 2007, after a wire transfer from the new escrow account into the old escrow account of funds intended to settle another mortgage transaction, the Attig mortgage.  On that day, Petrie had shown up unannounced at DSS's office demanding payment.

Postconviction counsel also argued that trial counsel should have challenged William Donivan's testimony that he was away from the business between January 2007 and June 2007 attending the New York State trial of the murderer of his brother and sister-in-law.[12] In support, Defendant has submitted Donivan's credit-card statement (Def.'s Ex. 12) and telephone records (Def.'s Ex. 13) indicating that Donivan was in York, Pennsylvania, at times he supposedly testified he was in New York. The apparent significance of these exhibits is that they could have been used to impeach William Donivan's testimony or show that he was more involved in the business than he admitted to.

Defendant has not cited to the record, and we can find no testimony by Donivan that he testified that he was not in York at all from January through June 2007. He did testify, apparently incorrectly, that the trial lasted six months, from January through June of 2007, (Doc. 75, ECF p. 151), but we have been unable to locate where he might have said he had not set foot in York during this six-month period. In fact, elsewhere in his testimony, he says that he was not always attending the trial. (Doc. 75, ECF p. 150 ("I was back from New York about that time taking a break from the trial"); ECF pp. 112-13 ("I was not there the whole time from January to this point in '07."); ECF p. 132 ("And at this time, again, it's not an excuse, it's a fact, I'm up in New York a lot of times attending this six-month trial.").  We therefore reject this claim.

_____

[12] Def.'s Ex. 11 consists of two newspaper articles describing the trial. The second article notes that it lasted about three months, from January through April 3, 2007. We will assume these articles are admissible as evidence.

24

At the 2255 hearing, postconviction counsel also presented Defendant's credit-card statement including charges that Defendant said were items she purchased for DSS. (Def.'s Ex. 20). Defendant contends the statement would have buttressed her testimony that some of her withdrawals were reimbursement for these expenses.

Trial counsel acknowledged that it would have been important to submit the statement to the jury but said that Defendant never gave him the information he needed to obtain this statement. In any event, we agree with the government that this claim lacks merit. That Defendant took reimbursement for DSS expenses she paid would not have been relevant to the legality of her withdrawals from the escrow accounts.[13]

Defendant also asserts that trial counsel was ineffective in refusing to subpoena Defendant's phone records. Defendant argues these records would have shown that William Donivan was constantly calling her and thus involved in the daily management of DSS. We disagree. Showing that William Donivan called Defendant numerous times would not have shown he was involved in the daily management of DSS. And even showing that he was phoning Defendant frequently would not have altered the outcome of the trial.

---

[13] We note that if Defendant had produced a written employment agreement and e-mails from William Donivan authorizing transfers from the escrow account(s), our conclusion might have been different.

F.  *Trial Counsel's Failure to Investigate and Call*
    *Certain Witnesses*

Defendant contends trial counsel was ineffective in not investigating and calling the following witnesses at trial.  For the reasons set forth below, we do not believe calling these witnesses would have changed the outcome of the trial.

**Joe Troutman.**  Defendant asserts Troutman would have testified that during 2006 and 2007 he visited DSS on multiple occasions to train Shannan Donivan and William Donivan on the Land America, "Title Wave" program designed to balance and reconcile the escrow accounts.  During these visits, the operating account and escrow accounts at DSS were available to Shannan and William Donivan.  Defendant asserts this testimony would have shown that both William and Shannan Donivan were trained in the use of escrow accounts and were actively involved in the day-to-day management of DSS, contrary to their trial testimony that they were not involved in the business and had nothing to do with the escrow accounts.

We see no ineffectiveness in not calling this witness.  There was no issue at trial whether William Donivan or Shannan Donivan were trained in handling the escrow accounts, nor was it crucial, for reasons stated above, to determine their level of involvement in the day-to-day operation of the business.  Defendant was convicted of wire fraud by a showing through a series of checks that she transferred funds from the old escrow account to the operating account and then to her own bank account.  It was sufficient that Defendant had check-writing authority over the DSS accounts and that transferring funds was part of her duties.  Indeed, Shannan Donivan testified that she had

check-writing authority; the issue was whether she had signed certain checks.  Showing

that others knew how to transfer funds would not have affected the outcome.  As to the

daily management of DSS, impeaching these witnesses' testimony in that regard would

not have affected the outcome of the trial because the major thrust of their testimony was

that Defendant was controlling the bank statements and check-writing.

**Robert Fortney.**  According to Defendant, she and William Donivan hired

Fortney to work for Exit Realty (or Exit Four Star) whose offices were located in the same

building as DSS in Mount Joy, Pennsylvania.  According to Defendant, Fortney would

have testified that: (a) William Donivan directed Defendant in Fortney's presence to move

money from one account of DSS to another; (b) contrary to William Donivan's trial

testimony, he and Defendant were having an affair; (c) William Donivan was involved in

the day-to-day management of DSS; (d) William Donivan was abusive of Defendant; and

(e) Defendant was to receive a salary from DSS.

It is irrelevant to Defendant's offense that she and William Donivan were

having an affair, or that Donivan may have been abusive to Defendant.  As already

stated, it is not significant that he may have been involved in DSS's day-to-day

management.  The impeachment value of contradicting William Donivan's denial of an

affair or that he was involved in DSS's daily operation would not have altered the trial's

outcome.

The other two assertions might have had some bearing on Defendant's

intent to defraud, which is why we decided that Fortney's testimony should be explored at

the 2255 hearing. However, Fortney did not appear at the hearing so we cannot provide relief on the basis of Fortney's proposed testimony in that regard.

**Amber Hoover.** Hoover is Defendant's daughter. According to Defendant, she would have testified that: (a) William Donivan and Shannan Donivan were involved in the day-to-day operations of DSS; (b) William Donivan would come to Defendant's home to work on DSS issues; (c) William Donivan left "an intimate voice message" for Defendant, "to wit, 'I love you.'" (Doc. 94, ECF p. 2); and (d) Hoover "was also aware" that Defendant was receiving a salary from DSS. (*Id.*).

As noted above, the first three areas of testimony would not have changed the outcome of the trial. Any impeachment value of testimony that William Donivan, contrary to his testimony, did participate in DSS's daily management and did have an affair with Defendant would not have undermined the trial's outcome.

The last area might have had a bearing on Defendant's intent, which is why we decided that Hoover's testimony should be explored at the 2255 hearing. Hoover did testify but her testimony did not assist Defendant. She said that William Donivan was involved in every aspect of the business, but she never saw him with a bank statement. She also testified she had no knowledge of an employment contract for her mother.

**Shawn Kane.** According to Defendant, Kane owns a computer company called Central Penn Networking and was hired in 2006-2008 to work for DSS. According to Defendant, "Kane knew that any decisions in DSS were made by William Donivan and Shawn Chambers-Galis." (Doc. 94, ECF p. 3). He sold DSS all of its computers and

"would contradict William Donivan's testimony at trial that William Donivan received a $3,000.00 check from DSS for reimbursement of William Donivan's purchase of computers William Donivan stated he bought from his brother, Jim Donivan." (*Id.*).

Donivan did testify at trial that he received a $3,000 check from the operating account to reimburse him for having bought computer equipment for DSS. (Doc. 75, ECF p. 137). However, Donivan never testified he had purchased the equipment from his brother. Hence there would be no need for Kane's testimony to rebut Donivan's testimony in that regard. As to Kane's knowledge that "any decisions in DSS" were made by Donivan and Defendant, this broad statement has no bearing on the conduct underlying the offense and also has no impeachment value.

**Patricia Shertzer.** Defendant employed Shertzer in 2006 as a house cleaner, and William Donivan later employed Shertzer to clean DSS offices in York and Mount Joy. According to Defendant, Shertzer would testify that: (a) there was "an intimate relationship between Bill Donivan and Shawn Chambers Galis"; (b) Shertzer "was present on one occasion when Bill Donivan told Shawn to sign Bill Donivan's name to a DSS check for Robert Fortney"; and (c) Shertzer "was also present in Bill Donivan's private offices in York and Mt. Joy and knew that he was running the business on a day-to-day basis." (Doc. 94, ECF p. 3).

The failure to call Shertzer was not ineffective assistance of counsel. That Donivan and Defendant may have been having an affair, or that in some general sense he was involved in the daily operation of the business, was irrelevant to Defendant's

offense.  The impeachment value of such testimony also would not have changed the outcome.  Without more detail, it is also irrelevant that on one occasion Donivan asked Defendant to sign his name to a check for Fortney.[14]

### G. *The Claim that Trial Counsel Failed to Obtain a Handwriting Expert*

Defendant claims that trial counsel was ineffective in failing to obtain a handwriting expert to verify that Shannan Donivan's signature on the DSS checks, which Shannan Donivan testified were forged by Defendant, were in fact signed by Shannan Donivan.

As noted above, Defendant has the burden in these 2255 proceedings of showing that trial counsel was ineffective.  Defendant did not present a handwriting expert to show that Shannan Donivan's signature on the relevant checks was really hers. On that basis, we reject this claim.

### H. *The Claim that Trial Counsel Was Ineffective in Not Obtaining the Hard Drives from William Donivan's and DSS's Computers*

Defendant claims trial counsel was ineffective in failing to obtain the hard drives from William Donivan's and DSS's computers.  These hard drives would have contained her written employment agreement with DSS and e-mails from William Donivan.  The employment agreement would have buttressed Defendant's trial testimony

---

[14] Defendant also named as a witness David Crill, a court-appointed investigator. Crill's purported testimony would add nothing of substance.

that she was entitled to compensation and to reimbursement for her out-of-pocket expenses. The e-mails would have shown that Donivan authorized Defendant to transfer funds from the escrow accounts to her own bank account, thus negating an intent to defraud on her part.

At the 2255 hearing, trial counsel testified that Defendant had told him that she wanted him to examine the DSS computers because these would have contained a copy of her employment agreement and the e-mails from William Donivan authorizing her to transfer funds from the escrow accounts. He attempted to obtain the DSS hard drive in two ways. First, when he subpoenaed the government for relevant information, the subpoena was broad enough to cover DSS's computer, but the government did not produce it.[15] Second, the investigator he hired to assist him in the case also attempted to locate the DSS hard drives but was unable to do so, even though William Donivan and other principals and employees of DSS were in the area.

In any event, trial counsel testified at the 2255 hearing that he did not consider the employment agreement relevant to the defense as the agreement could not have authorized Defendant to take funds from the escrow accounts. As for e-mails that might have been on the DSS hard drive, Defendant had given him other e-mails, and the

---

[15] In her reply brief on her motion for discovery, Defendant alleged that the government said that it never had William Donivan's or DSS's computers in its possession, but that it would search its files to determine if the computers exist and if so, where. (Doc. 93, p. 2). In denying the discovery motion, we did require the government to tell Defendant what it knew about these computers and what steps it took to take possession of them. (Doc. 96). Defendant did not explore at the 2255 hearing whether the government ever had these computers. We conclude the government never possessed them.

latter e-mails showed that she questioned what William Donivan was doing, questioned why moneys were being taken out of the escrow account, showed that she knew what the escrow and operating accounts were, and showed that she had a detailed knowledge of DSS's operations.[16]  In these circumstances, we decline to find that trial counsel was ineffective in not locating other e-mails that would have shown William Donivan authorizing transfers from the escrow accounts.

I. *The Claim that Trial Counsel Was Ineffective in Not Explaining to Defendant About the Government's Offer of a Plea Bargain*

Defendant claims that trial counsel was ineffective in refusing to explain the government's offer of a plea bargain to her.  The 2255 hearing provides the background.  The government had extended a plea offer to Defendant in which she would plead guilty to the wire-fraud count and the government would dismiss the money-laundering counts.  The government also agreed that the guideline range could be reduced for substantial assistance.  (Govt.'s Ex. 1, e-mail from trial counsel to Defendant, dated June 22, 2010).  Counsel testified that he gave Defendant a copy of the plea agreement and explained the terms to  her, along with the guideline range, meeting with her several times.

The deadline for accepting the plea was originally July 2, 2010, but by way of an e-mail on July 29, 2010, the government extended it to August 10, 2010.  (Govt.'s Ex. 2).  In extending the deadline, the government also agreed to recommend a

---

[16]  In an e-mail to Defendant, dated June 22, 2010, trial counsel advised her to plead guilty, noting that "[w]e have e-mails from you wherein you appear to recognize the criminality of the activities of DSS."  (Govt.'s Ex. 1).

three–level reduction in the offense level for acceptance of responsibility rather than just a two-level reduction. (*Id.*). On July 30, 2010, trial counsel forwarded the government's e-mail to Defendant. On August 8, 2010, Defendant replied by an e-mail, stating in part that she did not understand what the government meant when it spoke about "the level two as opposed to level three, and what that mean[t] to [her] in the long run." (Govt.'s Ex. 2).

Trial counsel testified he had a meeting with Defendant in his office at some later date that he cannot remember. At that meeting, he explained the difference between a two-level and three-level reduction and indicated what the reduced sentencing range was. They talked about documents and witnesses. Defendant said she wanted to think some more about the plea agreement, and he reminded her of the deadline. She wanted to know if probation was possible. He said that probation was more possible if she pled guilty and thinks he also told her he did not think this was a probation case. She made no decision at the meeting and gave him no answer before the August 10 deadline.

At the August 17, 2010, status conference, the prosecutor once again extended the deadline for the plea, to the close of business that day. (*Id.*, ECF p. 5). Defendant did not accept the plea. On August 17, 2010, after the status conference, she e-mailed trial counsel, asking if William Donivan had been indicted. On August 18, 2010, trial counsel replied by e-mail that he did not know how to confirm if Donivan had been indicted and said that the offer of a plea bargain had expired so that the possibility of probation no longer existed. The mention of the expiration of the plea-bargain deadline

had been a response to a phone call from Defendant. Defendant replied by e-mail a few minutes later that "with that (sic) sentence the (sic) would recommend a plea was not the way to go" but that it would be worth it if "they would ask for probation." (Govt.'s Ex. 3). Trial counsel replied shortly thereafter by e-mail that they were past the deadline for a plea and that probation would have been possible only with a plea. (Govt.'s Ex. 3). Defendant replied by e-mail a few minutes later that she knew the deadline had expired but that she wanted him to know what she would be willing to accept in case he talked to the government. (*Id.*). Counsel expressed the view that Defendant refused the plea bargain because she wanted probation and the offer did not guarantee that.

Defendant testified at the 2255 hearing to another version of events. She said trial counsel told her his strategy was to make her plead guilty and sign a plea agreement. She testified that trial counsel refused to allow her to see the plea agreement. She also testified that when she and trial counsel met after the August 17, 2010, status conference, she asked to read the plea agreement. At that time, she also asked him to explain about the levels in enhancement. Counsel responded that it was not necessary to read the plea agreement and that the sentencing levels and enhancements were self-explanatory. Defendant testified she had zero understanding of the sentencing process and never understood what the plea agreement was. Defendant said she would have signed the plea agreement if it resulted in William Donivan's being charged and the truth being revealed. Otherwise, she had no expectation as to a sentence because she had no idea how the federal system worked. She denied

expressing a willingness to plead guilty if she could be assured of a sentence of probation.  She asserted her innocence but said she would have pled guilty because fighting the federal government is very difficult and she would have wanted to get on with her life.

To succeed on this claim, Defendant has to show that there was a reasonable probability that she would have accepted the plea bargain.  *Lafler v. Cooper*, ___ ___ U.S. ___, ___, 132 S.Ct. 1376, 1385, 182 L.Ed.2d 398 (2012).  Defendant has not made that showing for two reasons.  First, she testified that she would have pled guilty if William Donivan had been indicted; she made no mention of the terms of the plea bargain.  Second, we agree with trial counsel that Defendant would only have pled guilty if she could have been assured of probation, a condition that was not part of the government's offer.  We think Defendant's e-mails beginning August 17, 2010, confirm this.  Finally, in any event, we believe trial counsel explained the terms of the plea bargain to Defendant, including the effect of a three-level reduction.  Defendant herself testified that he wanted her to plead guilty so a refusal to explain the terms of a plea offer from the government makes no sense.  We therefore reject this claim.

J. *The Claim that Sentencing Counsel Was Ineffective*

The following claims allege sentencing-counsel ineffectiveness.[17]  First, counsel requested two postponements of sentencing to file objections to the presentence

---

[17]  As noted above, Defendant retained new counsel for the sentencing hearing.

report (PSR) and then filed no objections. Second, counsel failed to file objections to portions of the PSR that stated Defendant had engaged in conduct similar to the criminal offense on two previous occasions, (PSR ¶¶ 28 and 32), knowing that these similar incidents would lead to a more severe sentence. Defendant could have contradicted these allegations with her own testimony and other witnesses. Third, counsel said he would file post-trial motions but he failed to do so.

Defendant's first and third claims lack merit. As noted above, Defendant must show prejudice from counsel's performance. Defendant has not alleged any prejudice from the motions for sentencing postponement or from counsel's failure to file post-trial motions.

We provide some background on the second claim. As part of the relevant conduct, the PSR listed two previous incidents of alleged embezzlement by Defendant. In the first incident, Defendant began working for her sister's real estate agency in 1995, eventually acquiring her real estate agent's license. (PSR ¶ 23). Her sister discovered that Defendant was forging her name on checks and moving funds from the escrow account to the general account. She determined that Defendant had embezzled between $25,000 and $30,000. (PSR ¶¶ 23, 26, 28).

In the second incident, JUST, a charitable organization, was created in 2004 to assist the family members of homicide victims.[18] (PSR ¶ 29). Defendant was the president and treasurer. She refused to produce periodic treasurer's reports, as required,

---

[18] Defendant's brother was murdered in 2003. (PSR ¶ 53).

and group members requested to see all receipts and bank statements. Defendant eventually produced a treasurer's report that was forged. (PSR ¶ 30). It did not match the bank statements. (PSR ¶ 31). The other members of JUST reported her to the Bureau of Charitable Organizations in 2006. When the real bank statements were reviewed, almost all of the information Defendant reported to them was false and she had apparently used $5,637 of the group's money for her personal use. (PSR ¶ 32).

Defendant's sentencing counsel did not object to these portions of the PSR. At the 2255 hearing, Defendant testified that she had told counsel that she and her sister had had arguments over commissions. In her supplemental filing, she alleged that there were two witnesses who could have supported her contention that the charge of embezzlement was really a dispute with her sister over a commission and that accountants had found no irregularities in the books and records of her sister's real estate business. (Doc. 94, ECF pp. 4-5). In regard to the JUST embezzlement, Defendant testified at the 2255 hearing that she did not embezzle any money from JUST and that she expected sentencing counsel to object by submitting an auditor's report from the Bureau of Charitable Organizations indicating there were no problems with JUST. In her supplemental filing, she alleged that in addition to the report that the JUST member who took care of the books after her would have testified that the books and records were properly kept. (*Id.*, ECF p. 5).

We reject this claim because we do not believe Defendant when she says she did not commit the conduct described in the PSR. We also note that she failed to

produce the auditor's report or the witnesses who would have supposedly supported her story.[19]

III. *Conclusion*

Having considered all of the claims, we will issue an order denying the 2255 motion. The order will also deny a certificate of appealability, based on the analysis in this memorandum. However, Defendant is advised that she has the right for sixty (60) days to appeal our order denying her 2255 motion, *see* 28 U.S.C. § 2253(a), and that our denial of a certificate of appealability does not prevent her from doing so, as long as she also seeks a certificate of appealability from the court of appeals. *See* Federal Rule of Appellate Procedure 22.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

January 31, 2013

─────────────────────

[19] The two incidents were mentioned in calculating the specific offense characteristics under U.S.S.G. § 2B1.1(b)(1)(G), but did not affect the calculation of Defendant's sentencing guideline range. DSS had a loss of $258,894.34, to which was added a $25,000 loss to her sister and the $5,637 loss to JUST for a total of $289,531.43. Since this was more than $200,000 and less than $400,000, 12 points were added under section 2B1.1(b)(1)(G) to Defendant's offense level. (PSR ¶ 38). However, since the loss to DSS alone was in excess of $200,000, Defendant would have received 12 points in any event.

Defendant had a total offense level of 23 and a criminal history category of I, giving Defendant a sentencing range of 46 to 57 months. At sentencing, the prosecutor noted that because these two incidents did not affect the sentencing calculation, the court should sentence at the mid to high end of the range. (Doc. 77, ECF pp. 15-16). In addition to other parts of Defendant's history, the court mentioned these incidents in sentencing Defendant to the high end of the range.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,          :
                                   :
          v.                       : CRIMINAL NO. 1:10-CR-94
                                   :
SHAWN CHAMBERS-GALIS,              :
          Defendant                :


*O R D E R*


AND NOW, this 31st day of January, 2013, it is ordered that:

1.  Defendant's (Doc. 84) motion under 28 U.S.C. § 2255 to vacate her conviction and sentence is denied.

2.  A certificate of appealability is denied.

3.  The Clerk of Court shall close this file.

4.  Defendant may file a motion by March 4, 2013, to reconsider this order if examination of the DSS hard drives reveals information relevant to her 2255 motion.


/s/William W. Caldwell
William W. Caldwell
United States District Judge